STARKEY McDANIEL v. SUSAN KING and others.

*Will—Latent Ambiguity—Evidence of testator's intention.*

Where a testator devised his " home plantation," describing it in such manner as that upon the face of the will the court can see what land was meant to be included within its boundaries, *it was held* that evidence as to what the testator, at the time of making the will, " called and considered his home plantation," was properly excluded. Evidence *dehors* is only received to explain an instrument in case of a latent ambiguity, and no such ambiguity appears here.

(*Barnes* v. *Simms*, 5 Ired. Eq., 392; *Stowe* v. *Davis*, 10 Ired., 431; *Institute* v. *Norwood*, Busb., Eq., 65; *Jones* v. *Robinson*, 78 N. C., 396, cited and approved).

EJECTMENT tried at Fall Term, 1883, of JONES Superior Court, before *Philips, J.*

Plaintiff appealed from the ruling and judgment of the court below.

*Messrs. Battle & Mordecai, Batchelor & Clark* and *Strong & Smedes*, for plaintiff.

*Messrs. Green & Stevenson, H. R. Bryan* and *Walter Clark*, for defendants.

MERRIMON, J.   James McDaniel, senior, died in 1854, leaving a last will and testament, which was duly established, by which he devised and bequeathed to his numerous sons severally sundry tracts of land and much personal property, consisting of slaves, live stock, farming implements, &c.

Both the plaintiff and the defendants claimed to derive title to the land, the subject of this action, under the seventh paragraph of this will, the material parts of which provide as follows:

"Item 7th. I give and bequeath unto my son James McDaniel certain pieces or parcels of land, beginning at the mouth of the ditch at 'Cherry Tree Island,' then up the fresh ground cotton-patch ditch, thence to the centre of the water-oak flat, then a straight line to Pollock's Pocoson bridge, until it strikes or intersects with Starkey McDaniel's avenue, then with the avenue to the main road leading from Trenton to Trent bridge, then down said road to Antwine branch, then down the various courses of Antwine branch to Trent river, thence up the various courses of Trent river to my Comen's line near the bridge across said river at Trenton, then with the Comen's line to the main road near the mills, then up the mill pond to high water mark to the Comen place, then with said line to the main road above Trenton, then up the various courses of said main road leading from Trenton to William H. Bryan's line, and then with my own and Will. H. Bryan's line to Croocked run, then across said Croocked run and up with the various courses of said Croocked

run to the first station or beginning, including all improvements, dwellings and appurtenances, with the exception of the mills and mill seat near Trenton." * * * "To have and hold said estate of land and slaves to him and his heirs and assigns forever: *Provided, always,* should the said James McDaniel die leaving no lawful issue or heir surviving him, then said estate of land, slaves and personal property shall be equally divided as near as possible between my five or surviving sons, with the exceptions hereinafter named, share and share alike. And it is my will and desire that the *lands* bequeathed to my son James and known as my " *home plantation," and bounded as above,* and including the commons below Trenton, shall, at the death of my son James, he leaving no lawful heir or issue surviving him, descend to my son Nathan McDaniel, or his lawful heir or issue surviving him, to him, his heirs and assigns forever."

The plaintiff claims, as the sole surviving son of the testator, his brother James McDaniel, Jr., the first and principal devisee named in the paragraph cited, having survived all the other sons of the testator, except the plaintiff Starkey, and having died *without issue,* before the bringing of this action. He insists that the land in question, although within the boundary of land specified above, did not on the death of his father James pass to his brother Nathan McDaniel, or his heirs under the last clause quoted above, because, he alleges, it was outside, and not a part, of the " *home plantation"* of the testator; that is, he insists that the boundary specified in the 7th paragraph embraced more than the " home plantation," *mentioned and intended,* and that the land claimed by him was not a part of it, but outside of it within the same boundary.

The defendant contended that the words " home plantation " and *bounded as above,* and including the commons below Trenton," set forth in the last clause of the paragraph, constitute the " home plantation " as designated by the testator, and if so, it is conceded that the land in question is embraced by it.

On the trial in the court below, the plaintiff, contending that

it did not certainly appear upon the face of the will what constituted the "home plantation" of the testator, mentioned in the last paragraph as set forth above, asked a witness what the testator, at the time of the execution of the will, "called and considered his home place?" This question was objected to by the defendant and the court sustained the objection, and to this ruling the plaintiff excepted.

We think the court properly excluded the testimony thus offered. The testator certainly had the right to devise his "home plantation" and define what land and how much it should embrace, and that without regard to what had theretofore been designated by the description. It is very clear that he exercised that right with intelligence and unusual precision. He seems to have had a settled purpose to leave as little to doubt and construction as possible, and has succeeded, certainly in the clause of his will under consideration.

In the same paragraph, only parts of which are set forth above, he devises to his son James several other tracts of land, designating them not by boundary, but by name and locality. He likewise bequeaths to him numerous slaves and other personal property. All this property he gives to his son James, "his heirs, assigns forever," and adds, in the same immediate connection: "Provided always, should the said James McDaniel die leaving no lawful issue or heir surviving, then said estate of land, slaves and personal property shall be equally divided as near as possible between my *five, or surviving sons, with the exceptions hereinafter named,* share and share alike; and it is my will and desire, that the lands bequeathed to my son James, and known as my '*home plantation,' and bounded as above,* and including the 'commons' below Trenton, shall, at the death of my son James, he leaving no lawful heir or issue surviving him, descend to my son Nathan McDaniel, or his lawful heirs or issue surviving him, to him, his heirs and assigns forever."

Now, it is admitted that the testator's home, and what the

plaintiff insists was the "home plantation," are within the boundary specified.   There is but one boundary set forth in the paragraph; that boundary is *above* the provision as to the "home plantation" "and bounded as above"; there is no sub-boundary or any boundary specified inside the boundary given; it is one and one whole boundary, starting at a fixed point, "the mouth of a ditch," and passing in many directions, embracing a large body of land and ending at "the station or beginning."

There is nothing to which the words "and bounded as above" can have any, the remotest, reference, if they do not refer to the boundary mentioned.   If they do not apply to it, they must be treated as meaningless and mere surplusage.

This is unreasonable and cannot be allowed.   There is nothing in the paragraph under consideration, or in any other part of the will, that warrants such a construction.   The words "and bounded as above" coming next after the words "my home plantation," plainly indicate, and were certainly intended to indicate, what the testator meant by my "home plantation."   He knew that his home plantation was composed of sundry tracts of land, bought from various persons, at different times, and that it was important that he should define his meaning in that respect. In the first part of the paragraph he therefore fixed the boundary with certainty, and afterwards he devised his "home plantation, *and bounded as above*," to his son Nathan, in the contingencies mentioned.   It appears also that he well understood his purpose and how to effectuate it.   He had devised to his son James several tracts of land and much personal property, besides the land included in the boundary.   All this property he gave to his son James absolutely, unless he should die without issue, in which case this property so given him should go to his surviving sons, "*with the exception hereinafter named*."   Then immediately he provides the exception, to-wit, the exception of the "home plantation, and bounded as above," which he devises to his son Nathan, in the contingency that James should die without issue, thus leaving to the surviving brothers the tracts of land outside

of the boundary, and all the personal property, including the slaves. The phrase " and bounded as above" not only serves to indicate definitely what the testator meant by " my home plantation," but it points out with certainty and identifies the land devised to Nathan McDaniel in the contingency provided for, as certainly as if there had been a devise to him directly. " Home plantation" might be definite—it might not; but the boundary designated, specified, made it definite and certain.

If the testator had simply excepted his " home plantation," then a question might have been raised as to what lands composed it, and his meaning in respect thereto.

There is no ambiguity; nothing is left in doubt. The testator had the right to declare what should constitute his " home plantation "; he did so by fixing a definite boundary to it—one that leaves no doubt as to what he meant, looking at the plain legal import of the terms he employed to express his purpose in the will. It is so certain there is nothing to be explained or qualified.

Evidence cannot be heard to explain, add to, take from, modify, or contradict a will when its terms plainly indicate the testator's purpose as to persons or things mentioned in it. In such a case, it must be construed upon its own terms, just as a deed or other written instrument must be construed. If a will is sufficiently distinct and plain in its meaning as to enable the court to say that a particular person is to take, and that a particular thing passes, that is sufficient; and it must be construed upon its face without resorting to extraneous methods of explanation to give it point. Any other rule would place it practically within the power of interested persons to *make* a testator's will, so as to meet the convenience and wishes of those who might claim to take under it.

It is only where the will upon its face is intelligible—sufficiently certain—free from a doubt and ambiguity in its terms and phraseology, but ambiguity is raised by something, or circumstances, extraneous, outside of, or collateral to it, that evi-

dence *dehors* can be received, not to interpret or affect the will itself, but to explain and make certain the person or subject-matter to which it refers and applies.

In case the will describes and points to the person, object or subject intended, and there is more than one person, object or thing of like description, evidence is received to remove the ambiguity, and enable the court to reject one or more of the persons or things to which the description of the will applies, and to determine the person or the subject-matter the testator understood to be signified by the description in the will. For example, if a testator devise property to his cousin John Smith, and he has two cousins of that name; in such case, parol evidence will be received to explain which of the two the provision applied to. And so, also, if a testator have two "home plantations," one in one direction from his dwelling-house and the other in another, and he devises the home plantation to his son James, James may aver and prove that the devise to him applies to, and embraces, the one lying to the eastward of the other. Mr. Broom in his Legal Maxims gives this apt illustration on this subject : " A devise was made of lands to M. B. for life, remainder to her three daughters, Mary, Elizabeth and Ann, in fee, as tenants in common. At the date of the will M. B. had two legitimate daughters, Mary and Ann, living, and one illegitimate, named Elizabeth. Extrinsic evidence was held admissible to rebut the claim of the last mentioned, by showing that M. B. formerly had a legitimate daughter named Elizabeth who died some years before the date of the will, and that the testator did not know of her death, or of the birth of the illegitimate daughter." Broom's Legal Maxims, 475; *Barnes* v. *Simms*, 5 Ired. Eq., 392; *Stowe* v. *Davis*, 10 Ired., 431 ; *Institute* v. *Norwood*, Busb. Eq., 65 ; *Jones* v. *Robinson*, 78 N. C., 396.

The case before us does not present a question of *latent ambiguity ;* the question is, what constituted the " home planta-

tion " of the testator; he settled that definitely, and therefore the testimony offered was incompetent.

There is no error, and the judgment must be affirmed.

No error.                                                    Affirmed.